**FEDERAL MEDIATION AND CONCILIATION SERVICE**

-------------------------------------------------------------------------------x

In the Matter of the Arbitration between:

**INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, LOCAL 525,**
("Union"),

              -and-

**PRAIRIE FARMS DAIRY, INC.**
("Company", "Employer", or "Management")

Grievance: "Terry Laney Termination"
Grievant: Terry Laney

-------------------------------------------------------------------------------x

                                                   **OPINION and AWARD**

                                         **FMCS Case No. 180718-06537**

BEFORE:          Robert A. Grey, Esq., Arbitrator

HEARING:        January 23, 2019, Collinsville, IL 62234

APPEARANCES:

      FOR THE UNION:

           Schuchat, Cook & Werner, Esqs.
           By:   George O. Suggs, Esq.
                  William P. Suggs, Esq.

      FOR THE COMPANY:

           Hesse Martone, P.C.
           By:   Andrew J. Martone, Esq.
                  Willie T. McGarry, Esq.

### INTRODUCTION

On April 10, 2018 the Company terminated Grievant's employment on the basis of an April 4, 2018, incident, alleging, *"Serious Just Cause: Insubordinate behavior of abusive language toward a supervisor and making a threat to a member of management."* Joint Exhibit 4. The Union disputes the allegations, and seeks Grievant's reinstatement



with full back pay. The Company seeks denial of the grievance in its entirety.

Pursuant to the terms of the parties' Collective Bargaining Agreement ("CBA"), the undersigned arbitrator was selected by the parties and appointed by the Federal Mediation and Conciliation Service ("FMCS") to hear and decide this termination[1] grievance.

The hearing was held on January 23, 2019. Both parties appeared by counsel and were afforded full, fair and ample opportunity to present and challenge evidence, examine and cross-examine witnesses, and argue their positions. The parties did so. All testimony was given under oath or affirmation and direct observation of this arbitrator. The proceedings were transcribed by a court reporter and an official transcript was produced.[2] Neither party questioned the arbitrability nor fairness of the proceedings.

The record was closed upon receipt of exhibits and the parties' post-hearing submissions. The Union submitted a 20-page post-hearing Brief. The Company submitted a 28-page post-hearing Brief, and 16 labor arbitration awards, two (2) Occupational Safety and Health Commission decisions, and one (1) court decision.

This Opinion and Award is based upon detailed and thorough review and analysis of the entire record, including the arbitrator's assessment of witness credibility, conflicting testimony, and the relative probative value of all evidence in the record. All testimony, exhibits, party positions and post-hearing submissions have been

---

[1]      The parties used "termination" and "discharge" interchangeably. It is a distinction without a difference in this record.

[2]      Transcript page number citations are prefixed with "T".

thoroughly considered in rendering this Opinion and Award, whether or not specifically addressed herein.

## BACKGROUND / FACTS

The following pertinent facts are set forth in summary fashion, in chronological order where practicable.

The Company is a dairy cooperative of approximately 900 families, employing approximately 7,000 people, producing dairy products such as milk and ice cream. The Company has a number of facilities. Its Granite City, IL facility ("plant") operates 24 hours a day, in three (3) shifts of eight (8) hours each. First shift is 6:00 AM to 2:00 PM; second shift is 2:00 PM to 10:00 PM; third shift is 10:00 PM to 6:00 AM. The Union represents bargaining unit members at the plant, including Grievant.

Grievant began employment with the Company in August of 2014. At the time of his termination, Grievant's position was Machine Operator, usually assigned as a Filler on EQ70 machines at the plant, on the third shift.

On Wednesday, April 4, 2018,[3] Grievant began work at the plant four (4) hours early (*i.e.*, at 6:00 PM instead of 10:00 PM), performing voluntary repack/rebox overtime during the second half of the second shift. This work usually involves a crew of four (4) production employees, but the repack/rebox crew was short-handed this shift, with production employees Grievant and Janet Illig performing the work. The regular second shift production supervisors are Michael Jackson ("Jackson") and

---

[3]     All subsequent dates refer to 2018, unless stated otherwise. All titles, positions, *etc.*, refer to those in effect in April 2018, unless stated otherwise.

Antoine Simms ("Simms"), both of whom were supervising the April 4 second shift, including the repack/rebox crew that Grievant was working.

Shortly after 6:00 PM Grievant and Jackson had a brief discussion about the repack/rebox crew being short-handed, and getting additional crew. As a result of this discussion Jackson eventually added production employee Eugene Williams to the repack/rebox crew. It is undisputed that during this Jackson-Grievant discussion Grievant was not upset, and that Jackson and Grievant had no conflict during this interaction.

It is undisputed that Grievant was contractually entitled to a 15 minute break on the second shift, during the overtime portion of his extended shift. It is also undisputed that Grievant did substantially overstay his break time during the overtime portion of his extended shift.

As will be discussed below in the <u>Discussion and Opinion</u> section, Simms and Grievant interacted in the break room regarding the length of Grievant's break. Shortly thereafter, still during the April 4 second shift, they again interacted, this time on the work floor, regarding the length of Grievant's break. As their interaction on the work floor abruptly ended, Grievant was eventually directed to go to the supervisors' office with a shop steward. At the office, in the presence of Union shop steward Jake LeMaster, Grievant was suspended for allegedly threatening Simms during their interaction on the work floor. Grievant was then instructed to leave the plant, and talk to plant Human Resources Manager Richard Diak ("Diak") in the morning. As Grievant departed the office to comply with the instruction to leave the plant, he made another

allegedly threatening statement to Simms.

On April 10 Diak issued Grievant's termination letter. The letter states, in full, verbatim: "*We have completed our investigation. We have made the decision to terminate your employment from Prairie Farms under Article 11 Discharge or Suspension, Section 11.1 Serious Just Cause: Insubordinate behavior of abusive language toward a supervisor and making a threat to a member of management.*" Joint Exhibit 4.

On April 12 the Union issued the instant grievance. Joint Exhibit 3.

On May 9, pursuant to CBA Section 7.3, the parties held a Local Level Meeting regarding the grievance. The parties did not resolve the grievance at the meeting. They waived the Section 7.3 Joint Area Committee meeting, and instead advanced the grievance to arbitration.

On September 14 FMCS appointed the undersigned as arbitrator, pursuant to selection by the parties.

### RELEVANT CBA PROVISION

### ARTICLE 11; Discharge or Suspension; Section 11.1

The Employer *shall not discharge* nor suspend any employee *without just cause*, but in all respect to discharge or suspension *shall give at least one (1) warning notice* of the complaint against such Employee, to the employee, in writing, and a copy of the same to the Union *except that no warning notice need be given to an employee before he is discharged if the cause of such discharge is* dishonesty, or drunkenness or drinking of intoxicating liquor on the job, or being under the influence of or in the possession of illegal drugs, or the illegal use of dangerous drugs while on duty, or recklessness resulting in serious accident while on duty, *or serious just cause.* . . . [remainder omitted].

Joint Exhibit 1. (*emphasis* added).

## RELEVANT PLANT WORK RULES

STATEMENT OF POLICY
For the efficient, orderly and safe operation of our business, it is necessary that proper standards of conduct be maintained at all times. Prairie Farms Dairy, Inc. has established the following rules which employees are to observe. Any employee who fails to maintain proper standards of conduct or who violates any of the following rules shall be subject to corrective action. Such corrective action may range from verbal and written warnings, to suspension and discharge depending on the seriousness of the infraction. The Company reserves the right to deviate from these guidelines when circumstances warrant. These guidelines are not intended to be all-inclusive.

### BEHAVIOR STANDARDS

WORK PERFORMANCE
- Insubordination, including disobedience, or refusal to carry out assignments or instructions.

* * *

PERSONAL ACTIONS AND APPEARANCE
- Threatening, attempting, or doing bodily harm to another person.
- Threatening, intimidating, interfering with, or using abusive language towards others.

* * *

These guidelines are not intended to be all-inclusive. *The grievance procedure of the Master Dairy Agreement is available to resolve disputes.* The Company reserves the right to alter, change or amend these Work Rules while observing union contract language in Article 19 of the Local Addendum.

Company Exhibit 7. (*emphasis* added).

### STIPULATED ISSUES

The parties submitted the following stipulated issues for final and binding determination:

1.   **Was the Grievant discharged for serious just cause?**

2.   **If not, what shall be the remedy?**

## POSITIONS OF THE PARTIES

The positions of the parties follow, drawn from their respective post-hearing briefs, *verbatim*, or nearly so. They are set forth single-spaced, *in italics*, to denote they are *not* the words of the arbitrator. Footnotes and references may be omitted.

## Company Position

In summary, the Company maintains that: *Grievant, while being verbally counseled for failing to timely return from break, threatened Supervisor Simms with physical violence, constituting criminal assault, not mere horseplay; Grievant was insubordinate to Supervisor Simms; Grievant's testimony, and the testimony of his co-workers, establishes that discharge is appropriate, as do common sense, arbitration law, and the Company's past practice and work rules; Grievant's discharge should not be mitigated because Grievant showed no remorse for his behavior, and the Company has a legal duty to keep its employees safe; Grievant's denials should not be credited because they were undercut by his testimony; the testimony of Perry Martin, Steve Holman and Marty Riegel offered by the Union in support of Grievant's denials should not be credited; the Union failed to produce key witnesses Janet Illig, Eugene Williams, and Shop Steward Jake LeMaster at the hearing; and, the conduct attributed to Simms by the Union's witnesses does not excuse Grievant's misconduct.*

In more detail, the Company contends:

*Grievant escalated an oral counseling over his abuse of break time into an altercation with a supervisor; rather than accept an oral counseling, Grievant refused to discuss the matter, instead turning his back and walking away while Simms was attempting to discuss the matter with him. Overhearing Supervisors Simms and Jackson talking, Grievant reacted violently by walking around the pallet between them, and getting face-to-face with Simms. While face-to-face, Grievant called Simms "soft," threatened to "whip his ass," and declared that he "didn't give a damn about [the supervisors'] red shirts." Bargaining unit employees Janet Illig and Eugene Williams witnessed this. There were no other witnesses close enough to hear what was said.*

*After Grievant made the threats, Supervisor Jackson deescalated the situation by putting his arm across Simms and leading him away.*

*In response to the grievant's threat, Simms told the grievant that he was suspended and ordered Grievant to leave the building. grievant refused to leave. In an attempt to defuse the increasingly volatile situation, Supervisor Jackson asked that shop steward Jake LeMaster (who did not testify) be paged, and then moved towards the office. grievant continued his aggressive behavior all the way to the office: " . . . screaming, saying you don't*

*know what you're messing with. I'm not none of your boys around here. He said it again about the red shirts, I don't give a shit about the red shirts, . . ." Tr. 33-34. (Jackson). After discussing the issue with the Union Steward present, Grievant left the premises, but only after making further threats: "Yes. He told me, you remember that. And once he said you remember that, he said it in a threatening manner, [Jake] Lemaster was present then. I said, Jake, did you hear what he said, and he's like, yeah, I heard him, and they both exited." Tr. 65:3-9.*

*The Company conducted a thorough investigation and determined that grievant should be discharged for threatening Supervisor Simms and for his insubordinate behavior, noting that " . . . that it happened in the presence of another supervisor [Jackson], so there were two people present." The Company's decision to discharge grievant was consistent with the Company's action in prior situations. The Company has a consistent practice of always terminating employees who threaten supervisors. Tr. 19 Vice President of HR Harold Papen ("Papen").*

*Threatening a supervisor with physical violence is serious just cause under the terms of the Master Dairy Agreement because it " . . . undermines the authority of the supervisor, and quite frankly, I have done this for over 40 years, you can't get or keep supervisors if they are going to be threatened on the job." Tr. 19 Papen.*

*On May 9 the Company and the Union held a Local Area Meeting regarding the grievance. In this meeting, grievant was given another chance to explain his actions. He showed no remorse and twice failed to deny that he threatened Simms. "Bob [Kmetz, Plant Manager] directly asked him, did you make the threats to Antoine, and first time he didn't answer. He didn't respond at all. . . . [When asked a second time], "He said I don't recall. And then Bob said, well, that's not the same as saying you didn't, and at that point in time Mr. Laney said that, yes, I did, no, I didn't say it, and he said Juanita Jefferson was harassed by these same supervisors and she got her job back." Tr. 86-87.*

*Threatening a supervisor with physical violence is serious just cause that warrants discharge. Grievant threatened his supervisor. Supervisors Jackson and Simms consistently and independently testified that the grievant called Simms "soft" and threatened to whip Simms' ass, stating that he did not give a damn about Simms' red (supervisory) shirt. The grievant's self-serving denials should not be credited. grievant's conduct towards Simms was clearly insubordinate. Given grievant's lack of remorse and the severity of the offense, there is no basis to mitigate the discharge.*

*Under Illinois law, a person commits criminal assault "when, without lawful authority, he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery." 720 ILCS 5/12-1. In this case, grievant; 1) got in Simms' face; and 2) threatened to "whip his ass." grievant's conduct amounts to a criminal assault under Illinois law.*

The Company's Work Rules prohibit threats of violence (Co. Ex. 7) and threatening conduct includes conduct that creates a hostile, abusive or intimidating work environment. Simms reasonably felt threatened by the grievant. Simms testified Grievant was "very serious . . . to the point it kind of stunned me.", not kidding or joking. T61. Supervisor Jackson confirmed the serious nature of the grievant's threats.

Simms (and Jackson) intended to verbally counsel grievant about taking extended breaks - they had no intentions of writing him up.  grievant responded to their reasonable efforts to counsel him by disrespecting Simms, admitting that he turned his back on Simms and walked away, refusing to participate in the counseling.  Tr.137;138. This is clearly insubordinate conduct. Midwest Terminals of Toledo International, supra. grievant compounded his insubordination by refusing to leave the premises after [threatening] Simms. T at 33-34.

Grievant admitted in the arbitration that if he had gone up to Supervisor Simms and threatened to whip his ass he would expect to get fired. The Union's first witness, grievant's co-worker Marty Riegel (a 24-year employee) acknowledged that threatening a supervisor in the manner that the grievant threatened Simms in this case is a termination offense. T109. Clearly not only the grievant, but his co-workers were also on notice that threatening a supervisor with violence is a discharge offense. It is common sense that an employee can expect to be discharged if they are the aggressor in a physical altercation. Even if the Company had no rules or guidelines prohibiting physical aggression/workplace violence, discharge would still be appropriate.

The collective bargaining agreement explicitly states that an employee can be discharged on a first offense for serious just cause. Jt. Ex. 1, Art 11. Threats of violence and other such aggressive conduct cannot be tolerated, and discharge is appropriate when an employee threatens his supervisor. Veolia Transportation and ATU, Local 1637, 2006 WL 6827447 (Hart, 2006). The Company must maintain a safe workplace for its employees, and the grievant acknowledged that he could be discharged for threatening a supervisor. Tr. 142:3-10.

In addition, grievant's insubordinate conduct was grounds for discharge. Simms gave the grievant a lawful order to step to the side and have a conversation about the excess breaktime. The grievant turned it into a verbal altercation in which he threatened violence. In a previous decision between the Company and the Union, Arbitrator Sonneborn determined that insubordination under the work rules amounts to Serious Just Cause for purposes of determining appropriate discipline. Co. Ex. 10.

The Company's written and posted "Work Rules" prohibits "**threatening**, attempting, or doing bodily harm to another person." Co. Ex. 7. (emphasis added). The rules also prohibit "insubordination, including disobedience, or refusal to carry out assignments or instructions." Id. Violation of this rules can result in immediate discharge. Id.

Given that these work rules had been posted and had been in effect for approximately seven years prior to the grievant's discharge, the Union cannot now be heard to complain that the grievant was not on notice that his actions could lead to discipline. *Ogden Fairmount, Inc.*, 105 LA 492 (O'Grady, Arb., 1995). The grievant admitted that he would be terminated for threatening a supervisor in the manner in which he threatened Simms. Tr. 142:3-10.

Finally, the Company's Vice President of Human Resources, Howard Papen confirmed that the Company has consistently discharged every employee who has threatened a supervisor. Tr. at 18 (Papen).

Grievant takes no responsibilities for his actions and has never shown remorse. Tr. at 86-87 (Diak), Tr. at 142-143 (grievant). When a grievant refuses to show remorse for his misconduct, he should not be given another chance because the Arbitrator cannot be assured that the grievant will refrain from similar misconduct in the future. *Coach USA Transit Services*, 03-2 ARB, 3492 (Baroni 2003); see also *Koppers Industries, Inc.*, 06-1 ARB, 3438 (Halter 2006). This is especially important when the worker has been disciplined for workplace violence because the Company cannot expose its other workers to violent behavior.

The Company has a legal duty to keep its employees safe. Where an employer is required to discharge an employee in order to comply with its legal obligations, the employee's discharge is for just cause. *Telephone Employees' Credit Union*, 97 LA 412, 416, 417 (Cohen, 1991). In this case, continuing to employ the grievant in the face of his history of threatening supervisors would both put the Company in jeopardy of violating the Occupational Safety and Health Act ("OSH Act") and make the Company potentially liable under Illinois state law. The OSH Act requires the Company to keep the workplace "free from recognized hazards." See 29 U.S.C. § 654(a)(1) and imposes an affirmative obligation on employers to eliminate known risks to workers' safety. Workplace violence fits in the category of "recognized hazards." *Mason Hanger Corp. and Pan-Tex Guards Union, Local 38*, 111 LA 469 (Baroni, 1998). Employers have an obligation to address and prevent work place violence. All preventable forms and instances of hazardous conduct must...be entirely excluded from the workplace. *Nat'l Realty & Const. Co., Inc. v. Occupational Safety and Health Review Commission*, 489 F.2d 1257, 1266-67 (D.C. Cir. 1973). Thus, under this doctrine, the Company would be legally liable if the grievant initiates another physical altercation in the workplace. In this case, the only effective means available to protect the Company's employees from the grievant is to discharge grievant.

In the arbitration, the grievant's defense against Simms' and Jackson's testimony about his threats was nothing more than an unsupported denial. grievant told this same story before in a prior altercation with a different supervisor. The grievant's altercation with Simms is not the first time that grievant has attempted to explain away or justify his insubordinate behavior towards a supervisor by claiming that the supervisor was treating him

*in an inappropriate fashion. Shortly after the grievant was hired, he got into a similar altercation with Supervisor Mike Clark. The grievant's allegations against Clark are a mirror image of his allegations against Simms in this case. Co. Ex. 8.*

*As a matter of both arbitral law and common sense, the testimony of two supervisors without a stake in the outcome of the proceedings should be credited over the testimony of the grievant. Although the grievant testified that he did not believe that Simms or Jackson had an ax to grind with him, the grievant clearly had a problem with supervisor Simms. In short, based on the grievant's own testimony, his motive for threatening Simms is clear - the grievant had a problem with Simms because he resented the fact that Simms moved from the bargaining unit to become a supervisor and had a personal ax to grind with Simms as a result - a situation that the grievant nearly escalated into a physical conflict in a tavern outside of work hours. Tr. 143-144.*

*Bargaining unit members Janet Illig and Eugene Williams were the closest witnesses to the altercation other than Supervisor Jackson. However, the Union did not present their testimony in the arbitration. Instead, the Union offered the testimony of three witnesses, Perry Martin, Steven Holman and Marty Riegel in an attempt to paint Simms as the aggressor. Their testimony should not be credited. As an initial matter, none of the Union's witnesses was in a position to observe the altercation. In addition, their ambiguous testimony was further compromised by the fact that their testimony in the arbitration was contradicted by their prior, written statements (obtained by the Union).*

*In addition to the fact that Perry Martin was nowhere near the altercation when it occurred and could not hear what was being said, Martin's arbitration testimony differed markedly from the written statement he gave the Union shortly after the events at issue. Martin also had a personal reason to testify against Simms in this arbitration – the fact that Simms testified against Martin in his arbitration for a suspension for insubordination. Co. Ex. 10. Because Martin was not present when the altercation took place, because Martin is clearly biased against Simms, and because he contradicted his own written statement, Martin's testimony should not be credited.*

*Steve Holman also provided a statement regarding the incident. Co. Ex. 11. Holman admitted in his statement and at the arbitration that he could not hear what was said. Co. Ex. 11; Tr. 168:15-25. In addition, Holman's arbitration testimony contradicted his written statement, including his assertion that Simms was being "demonstrative."*

*Union witness Marty Regal did not witness the event in the rebox area. Riegel could not provide any pertinent testimony regarding the incident between grievant and Simms.*

*The night of the incident, the grievant was working with employees Janet Illig and Eugene Williams. According to grievant, Illig would have been in a position to see what happened. The Union failed to have Illig testify at the arbitration. Eugene Williams, who no*

*longer works for the Company, was the only other direct witness to the events, and the Union also failed to call him to testify.*

*It is not in dispute in this case that a steward was made available to the grievant. In fact, Supervisor Jackson ensured that Steward Jake LeMaster was paged on behalf of the grievant, (Tr. 49:21-50:3) and LeMaster was witness to the office conversation, the suspension of the grievant, and, ultimately, the final threats the grievant made when he finally left the premises. Id. However, as with Illig and Williams, the Union failed to produce Union steward LeMaster as a witness. It should be inferred that Illig, Williams and LeMaster were key witnesses who the Union believed would provide adverse testimony, and, therefore, decided not to produce them.*

*Even if the Union witnesses were to be credited (and they should not be), the conduct that they attribute to Supervisor Simms neither justifies nor excuses grievant's threats. The Union witnesses testified that Simms was "demonstrative", "raising his voice", "yelling", had a "menacing look" on his face, was "running/moving quickly to keep up with Laney." Even if these things were true, none of the conduct that the Union witnesses' ex post facto testimony (which contradicts their prior written statements) would justify the grievant's threats of violence. None of the witnesses, including the grievant, testified that Simms threatened the grievant. In fact, the grievant identified the "belligerent" conduct attributed to Simms was Simms explaining to the grievant that he was the supervisor on the shift and that the grievant had to follow his rules. Tr. at 148. While the grievant interpreted this Simms statement as treating him like a child, given that grievant played "I can't hear you", turning his back on Simms and walking away while Simms was trying to address grievant's overstaying his break, Simms' actions are both understandable and justifiable. If grievant had a problem with the way that Simms was addressing him, the appropriate mechanism would be to file a grievance and not threaten to "whip Simms' ass."*

The Company concludes (*verbatim*):

*The testimony of both Supervisor Antoine Simms and Supervisor Michael Jackson clearly and convincingly establishes that the grievant got in Simms' face, called Simms soft and threatened to whip his ass, exclaiming that he didn't give a damn about the red shirts (meaning that he did not care that Simms was a supervisor).*

*The grievant's unsupported denial should not be credited.*

*The appropriate penalty for threatening a supervisor with violence is discharge. The Company has uniformly treated threatening conduct directed toward supervisors as serious just cause, (discharging the employee making the threats), the grievant admitted in the arbitration that he knew he would be discharged if he threatened to whip his supervisor's ass, and 24 year employee*

*Marty Riegel confirmed that employees knew that engaging in threatening conduct of this nature would result in their discharge.*

*There is no reason to mitigate the discharge in this case. This is especially true given both the serious nature of the misconduct involved (and the Company's duty to maintain a safe workplace) and the fact that the grievant has never shown remorse for his actions.*

*The grievant was discharged for serious just cause. The grievance should be denied in its entirety.*

Company Brief 27.

## Union Position

*In summary, the Union maintains that: the evidence does not support a finding of serious just cause; Supervisor Simms was the aggressor; the Employer failed to conduct a full investigation before deciding to terminate the Grievant; the Grievant has no record of engaging in insubordinate or threatening behavior; and, that even if the arbitrator determines that the Grievant engaged in the alleged conduct, it still does not constitute serious just cause, and therefore a warning was required before the Company could discharge Grievant.*

*In more detail, the Union contends:*

*The Union and the Employer are parties to a CBA that establishes wages, hours, and working conditions and employees covered by the agreement can only be terminated for cause. (Jt. ex. 1) Under the terms of the CBA, the Arbitrator is clearly empowered to determine any factual disputes, whether the Grievant committed an offense, whether the alleged offense warranted discipline, and the degree of discipline imposed by the Employer. (Jt. ex. 1, sec. 7.9) Just cause allows the Arbitrator to determine, not only whether the Grievant committed an offense, but also whether discipline was warranted and whether the chosen discipline was appropriate under the circumstances. Here, the Employer has the additional burden to prove that Grievant engaged in conduct that constituted serious just cause for discharge that would excuse the contractual requirement of a prior written warning notice. (Jt. ex. 1, sec. 11.1) The evidence before the Arbitrator demonstrates that Employer has not met that burden.*

*Whether the Arbitrator draws factual findings from the Employer's witnesses, the Union's witnesses, or both regarding the conduct of Grievant and Mr. Simms, the evidence supports a finding that serious just cause did not exist. The weight and credibility of the evidence supports the finding that the Grievant did not threaten Mr. Simms and that, at worst, he engaged in mild insubordination by trying to avoid Mr. Simms' confrontational behavior. Additionally, Mr. Simms' conduct was an unnecessary escalation that Grievant*

reasonably considered to be both harassing and demeaning. The Employer did not complete a thorough investigation of the events before making a decision to terminate Grievant and Grievant has no record of engaging in any threatening or insubordinate conduct. These factors before the Arbitrator do not support a finding that the Grievant's conduct constituted serious just cause for discharge without a warning and the Arbitrator should order a remedy consistent with that finding.

Because the Employer bears the burden of proof, the testimony of the Supervisors must overcome the account given by the Grievant and other production workers who witnessed the events as they unfolded. Mr. Holman and Mr. Riegel are workers with whom the Grievant does not normally work and therefore does not have a personal relationship that would influence their testimony. (See tr. pg. 166) Each of their accounts corroborate the Grievant's testimony that Mr. Simms had already addressed the issue of the break time with the Grievant but he decided to bring the issue up again. Their testimony further supports the Grievant's that he sought to get away from Mr. Simms' after he demonstrated aggressive behavior. (Tr. 110, 119, 167) Neither testified that the Grievant made the expletive-laden statements that Mr. Simms and Mr. Jackson accuse him of making. Furthermore, the Grievant denies making those statements.

The Employer must rely on Mr. Simms testimony alone to prove that Mr. Simms did not engage the Grievant aggressively because Mr. Jackson did not observe this part of their interaction, while the Grievant and Union witnesses all observed it. Given the weight of the testimony that supports a narrative counter to that given by Mr. Simms, the Arbitrator should find that the evidence does not support a finding of serious just cause. Instead, he should find that the Grievant and Mr. Simms had an audible disagreement on the floor after the Mr. Simms refused to allow the Grievant to exit the encounter. At worst, the Grievant's conduct constituted mild insubordination even if it was a reasonable response to Mr. Simm's.

In addition to the testimony supporting the Grievant's narrative of events, the Employer's witnesses provided testimony which was inconsistent and at odds with the testimony of three production workers so their credibility as witnesses should be given less weight in the Arbitrator's factual determinations.

The inconsistency of Supervisors Simms' and Jackson's testimony supports a finding that their accounts of the events are less credible than the account given by the Grievant and other production workers. The language that Mr. Simms and Jackson allege that the Grievant used to threaten Mr. Simms is inconsistent. In his testimony Mr. Jackson said that the Grievant said "I don't give a shit about the red shirts." (Tr. pg. 32) Meanwhile, Mr. Simms' statement says the Grievant said, "[y]our soft, I'll whip your ass, I don't give a damn about that red shirt." (Co. ex. 3) Additionally, Mr. Simms' statement indicates that Mr. Jackson simply stuck his arm between the two of them but his testimony indicates that he actually grabbed Mr. Simms and pulled him away. (Co. ex. 3, tr. 34) Mr. Jackson also testified that there "was nothing aggressive about Mr. Simms" yet he did not witness Mr. Simms' initial

confrontation with the Grievant. (Tr. 34) His observations about Mr. Simms conduct were limited because he was distracted by another employee and his testimony should be treated accordingly.

While the differences are minor, they appear in both the testimony and the written statements provided by each supervisor when the events were fresher in their minds. (Co. exs. 2, 3) Their failure to remember the same supposedly shocking words indicates that their recollection of the events is suspect and should be treated accordingly by the Arbitrator.

In addition, much of the conduct that the Supervisors described in their statements and testimony is inconsistent with their allegation that the Grievant was acting in a threatening manner toward Mr. Simms. First, Mr. Jackson had a positive interaction with the Grievant earlier in his shift, indicating that the Grievant was not inclined to engage in threatening behavior. (Tr. 37-38) Mr. Jackson observed Mr. Simms and the Grievant in a tense situation and decided, ultimately, to grab Mr. Simms and pull him away rather than the Grievant. (Tr. 34) Restraining Mr. Simms indicates that he, and not the Grievant, posed the threat and grabbing hold of him would neutralize that threat. Finally, despite the allegedly shocking and threatening behavior of the Grievant, his Supervisors decided to keep him in the same room as them while they awaited his shop steward. (Co. ex. 2, 3) It is not consistent to consider a person a threat and continue to keep them in close proximity if that person actually elicits a reasonable fear of causing harm.

Mr. Simm's own testimony reflects the fact that the events as he describes them make no sense in context. His own statement indicated that the Grievant's reaction made him feel "shocked". (Co. ex. 2) And in his testimony, Mr. Simms agreed that the Grievant's reaction, allegedly with no provocation, made no sense to him. (Tr. 81) Given the alleged facts, Mr. Simms is correct that the Grievant's alleged reaction makes no sense. A more reasonable explanation is that Mr. Simms provoked the Grievant in the manner described by the Grievant and two other witnesses. For that reason, the Arbitrator should consider the more reasonable explanation for the inconsistencies and conduct that goes beyond reason rather than those proffered by the Employer.

There is ample evidence that Mr. Simms had the opportunity to address the Grievant in the break room, that he actually did address the Grievant there, then did so again on the floor. This implies that addressing him on the floor, whether the first or second time, was an unnecessary escalation. This evidence supports the conclusion that Mr. Simms was the aggressor and provoked the Grievant who attempted to walk away.

Since Mr. Simms was the aggressor in his interaction with the Grievant, the Grievant's response was a reasonable reaction to Mr. Simms' aggression. Both the Grievant and Riegel were present in the break room when Mr. Simms approached both of them and told them that they had taken too long of a break. (Tr. 110, 119) The Grievant, Riegel, and Holman provided testimony that was consistent with this narrative. (Id., see id. at 167 [Holman

testified that the Grievant told him that Mr. Simms had already addressed him in the break room.]) This would be consistent with the Employer's policy of having a conversation with an employee who had taken too long of a break rather than issuing discipline. (Tr. 58) By approaching the Grievant and harassing him about the matter after already addressing it with him in the break room, Mr. Simms abused his authority as a supervisor by confronting the Grievant in front of his coworkers over a matter that had already been addressed. The Grievant's response to Mr. Simms raising the issue of his break time again by acknowledging the issue and attempting to return to work to avoid confrontation was a reasonable reaction. The Grievant was understandably offended by having a supervisor seek to berate him about a matter that had already been raised in the break room. (See tr. 124-5)

Evidence of Mr. Simms acting as the aggressor in his interaction with the Grievant is also supported by witnesses to the events as they unfolded. Perry Martin had a clear view of Mr. Simms' interaction with the Grievant. (Tr. 153-54) He testified that Mr. Simms "shot out the door" toward the Grievant, addressed the Grievant with a "loud and menacing" voice, then "lit into him" while the Grievant tried to get away. (Tr. 152, 155) He further wrote in his statement that Mr. Jackson had to push Mr. Simms back, that Mr. Simms proceeded to yell all the way to the office, and the Grievant was simply "trying to remove himself from the situation[.]" (Co. ex. 9) Steve Holman also had a clear view of their interaction and described Mr. Simms as the aggressor.  He described Mr. Simms' approach to the Grievant as "moving like he's upset about something", saw that the Grievant tried to get away from him, and that Mr. Simms pointed at the Grievant. (Tr. 168-69) He also affirmed in his written statement that often "Supervisors talk to you about it and then want to come on the floor and still continue to harass you." (Co. ex. 11)

This testimony and documentary evidence supports the conclusion that Mr. Simms was the aggressor in his interaction with the Grievant and is responsible for creating an incident with the Grievant. His conduct regarding an issue that he had already addressed and instigating a confrontation on the floor caused the Grievant's response to that treatment. Employees other than the Grievant have complained of supervisors of harassing them in this way. (Co. ex. 11) At worst, the Grievant's conduct of trying to end the encounter by walking away constituted mild insubordination for refusing to be subject to Mr. Simms' harassment. However, the evidence on the record does not support the Employer's assertion that the Grievant threatened or engaged in insubordination that rose to the level of serious just cause. And the evidence that is on the record demonstrates that Mr. Simms' role in instigating a confrontation mitigates the response by the Grievant.

In its investigation of the interaction between Mr. Simms and the Grievant, the Employer failed to conduct a full investigation and failed to gather material evidence from eyewitnesses to the events. Richard Diak, the Human Resources Manager, relied on the statements provided by two supervisors and the statement given by the Grievant to decide to terminate the Grievant. (Tr. 83-85) One of these two supervisors admitted in his testimony that he did not actually witness Mr. Simms and the Grievant's initial interaction because he

was distracted. (Tr. 43) So for the purposes of evaluating Mr. Simms and the Grievant's initial interaction, Mr. Diak relied only on the conflicting statements of the Grievant and Mr. Simms.

Additionally, the Grievant gave the names of two other potential witnesses that Mr. Diak never interviewed. (Tr. 92-93) He also never asked Mr. Simms or Mr. Jackson whether there were other witnesses to the events that could provide statements. (Tr. 92) Because of his limited investigation, Mr. Diak never knew that Mr. Simms had already confronted the Grievant in the break room about the length of his break. (Tr. 94) From the evidence, it would be reasonable to conclude that Diak was not interested in gathering facts that did not support the version given by his supervisors. Because of Mr. Diak's limited investigation into the matter, Mr. Papen's decision to terminate the Grievant was made without a reasonable inquiry into the relevant facts. This failure is offensive to the notion of industrial due process and the Arbitrator should fashion the appropriate remedy to cure this violation.

Though the Grievant's record of employment is not extensive, his record does not indicate he would be likely to engage in threatening behavior or insubordination. The Employer never issued a warning for the Grievant's conduct prior to his termination. This evidence is relevant in that the CBA's just cause provision requires that there be a warning provided before there is just cause for termination. Without it, the employer must demonstrate that serious just cause exists. It is also relevant because the Grievant's record of nonthreatening and obedient conduct does not support the Employer's allegation that he threatened his supervisor and refused to comply with his demands. In fact, the only past conduct of the Grievant on the record here is that of another supervisor harassing the Grievant in a manner similar to Mr. Simms in this case. (Tr. 132, co. ex. 8) In contrast, Mr. Simms was involved in another confrontation with an employee who received a suspension as a result. (Tr. 35) The Arbitrator should consider these mitigating factors when making his finding and reject the Employer's imposition of discipline.

Should the Arbitrator find that the events unfolded in the manner that the Employer's witnesses alleged, it still does not rise to the level of serious just cause to allow for the Employer to terminate the Grievant. Serious just cause under the CBA is distinct from just cause. In order to terminate or suspend an employee for just cause, the employer is required to give at least one warning notice to the Employee and the Union. The Grievant never received a warning for his conduct in this case so the Employer must prove that the Grievant's conduct constituted serious just cause.

Serious just cause is not explicitly defined but it is likened to "dishonesty, or drunkenness or drinking of intoxicating liquor on the job or being under the influence of or in possession of illegal drugs, or the illegal use of dangerous drugs while on duty, or recklessness resulting in serious accident while on duty[.]" (Jt. ex. 1, sec. 11.1) Threatening a supervisor and insubordination are not defined but they are unlike the other examples that constitute serious just cause. Each of the specified categories include a form of illegality or

*imminent danger that an exchange of words and refusal to be obedient does not include. Also, had the parties intended for threats or insubordination to constitution serious just cause, they would have specified under these terms as they did with the use of drugs and alcohol. Because they did not, it stands to reason that a warning is needed as the parties included language which would distinguish more serious conduct from common occurrences like those in this case.*

*Following the plain, unambiguous meaning of "serious", it does not follow that the Grievant's conduct was proscribed by the CBA. "Serious" is defined as something "[i]mportant; weighty; not trifling; grave" or "[g]iving rise to apprehension; attended with danger; as, a serious injury." Webster's Dictionary, 2nd ed. (1934). The examples given in the CBA of conduct that would constitute serious just cause demonstrate further that the parties intended to follow this definition of "serious" when they included serious just cause as each refers to a grave or dangerous activity.*

*Nothing about the Grievant's conduct can be considered "grave" or "dangerous" enough to warrant termination without following the required warnings, even following the most damming account of the disputed events. Insubordination and engaging in a shouting match on the floor does not constitute the type of behavior that the parties to the contract sought to include under serious just cause. The Grievant and Mr. Simms never made any form of physical contact with one another and both were permitted to remain in the same room together, signaling that any perceived threat was minimal. This conduct stands in stark contrast to the operation of heavy machinery under the influence of drugs or alcohol which has a substantial likelihood to cause grave bodily harm to oneself or others. Out of deference to the truly serious conduct meant to be encompassed under "serious" just cause, the Arbitrator should find that this comparatively minor encounter does not rise to that level.*

The Union concludes (*verbatim*):

*The evidence on the record before the Arbitrator does not support a finding of serious just cause and the Arbitrator should fix the appropriate remedy. The sheer weight of the evidence, the role of Mr. Simms in instigating the events, and the inadequate investigation by the Employer into the events further support such a finding. But even should the Arbitrator make credibility findings that favor the Employer, the alleged conduct does not rise to the level of serious just cause that the parties intended when they agreed to the term in the CBA.*

*For the foregoing reasons, the Union requests that the Arbitrator sustain the grievance and fix the appropriate remedy for this violation of the CBA.*

Union Brief 19.

### DISCUSSION AND OPINION

For the reasons that follow, it is persuasive from the record that the Company met its burden to prove it had serious just cause, as that term is used in CBA Section 11.1, to discharge Grievant without giving a written warning notice. However, under the mitigating facts and circumstances of this particular record, discussed below, and consistent with the just cause for discharge requirement of CBA Section 11.1, Grievant's discharge should be reduced to a time-served suspension, without pay.

The critical sub-events in this matter must be viewed together, not separately and disconnected. They are, in chronological order, the Simms-Grievant interactions in the break room; on the work floor; and at the supervisors' office. These related and close-in-time sub-events are inextricably linked to Grievant's discharge.

As is frequently the case, substantial and significant variation exists between testimonial versions of what happened. There is also substantial and significant variation between testimonial versions of what happened, and the respective prior signed and notarized statements in the record. This is particularly so regarding the work floor and break room sub-events. These variations are often materially contradictory.

Material variations and contradictions are not necessarily indicative of lying or lack of candor. Rather, otherwise credible perceptions and memories can vary from their very formation, and are subject to change over time. One can truthfully testify about one's recollections and still be factually incorrect. Based upon detailed and thorough review and analysis of the entire record, including the arbitrator's assessment

of witness credibility, conflicting testimony, and the relative probative value of all evidence in the record, the arbitrator finds it more likely than not as follows (not in chronological order).

Relevant Work Floor Interaction

Simms approached Grievant on the work floor to discuss Grievant's extended break. At Simms' direction they moved away from co-workers, stood face to face, and discussion began. T71-72. It is undisputed that the work floor was noisy because of the nearby machines and conveyor belts in operation at the time, and that both men were wearing mandatory hearing protection. Thus, it is not remarkable that in order to hear each other they were face to face.

While Simms was speaking to him, Grievant walked away, toward the pallet Grievant had been working on, despite knowing that the supervisor's discussion was not over. As Grievant began to walk away, Simms informed/reminded him that the discussion was not over. Grievant unilaterally decided it was over and returned to the pallet. Simms continued to call after Grievant to resume the discussion. Grievant "*raised up*" from bending over his work on the pallet (T45), walked around the pallet, and approached Simms. T59-61; 71-79. Grievant and Simms were soon face to face again, in closer proximity than before, but without any physical contact. T61. Grievant said to Simms:

According to Jackson:   *"You're soft, I'll beat your ass."* (T33, Jackson direct), or, *"You're soft, you weak, I'll beat your ass and I don't give a shit about the red shirts."* (T47, Jackson cross), or, *"[Simms] was soft and that [Grievant] would beat [Simms'] ass."* (Company Exhibit 2).

According to Simms:  *"[Y]ou soft, I'll whip your ass, I don't give a dam about that red shirt."* (T60, Simms direct; T80-81 Simms cross), or, *"Your soft, I'll whip your ass, I don't give a damn about that red shirt."* (Company Exhibit 3).

Under the facts and circumstances of this record, the Simms and Jackson variations of the exact words and phrasing uttered by Grievant to Simms on the work floor are immaterial – both supervisors' testimonies were credible in this regard, and their reasonably varying words and phrasing are equivalent in sum and substance. As discussed below, despite Grievant's denial, any of the above versions of Grievant's work floor statement to Simms constituted a threat.

Upon the threat being made, Simms told Grievant that he (Grievant) needed to leave the facility, while Jackson separated them. At first Grievant said *"I'm not going anywhere."* However, moments later Grievant did comply with Jackson's instruction to proceed to the supervisors' office. T49.

Relevant Supervisors' Office Interaction

At the supervisors' office, with Union shop steward LeMaster present, Grievant was told he was suspended, and did shortly thereafter leave the plant as instructed. As Grievant left the supervisors' office, he stated to Simms: *"You remember that."* Simms perceived this to have been said to him by Grievant in a threatening manner. There is no allegation of any physical threat or contact. T65; 80.

Relevant Break Room Interaction

A multitude of material discrepancies exist between the written statements and testimony of Simms, Jackson, Grievant and Riegel about what did, or did not, occur in

the break room. These include, *inter alia*, who entered the break room together, or,

entered separately; who was in the break room before, or, at the same time, as whom;

who did, or, did not, say anything in the break room; and, if something was said, who

said it, the content of what was said, to whom it was said, and at whom the speaker

was, or, was not looking.

Neither supervisor's contemporaneous written statement makes *any* mention of

*any conversation, discussion or interaction whatsoever* taking place with Grievant in the

break room on April 4, at any time at all.

The full extent of break room content in Jackson's statement is:

> *I was walking into the breakroom going to the conference room Terry*
> *[Grievant] came in the break room 7:50 PM Antoine [Simms] and I*
> *acknowledged the time Terry came in for break. I left and went back on the*
> *floor. Then Antoine came back on the floor about 8:25PM and Terry Laney*
> *was just coming back from break.*

Company Exhibit 2.

The full extent of break room content in Simms' statement is:

> *Mike Jackson and I were walking through the breakroom going to our*
> *conference room about 7:50 PM. We noticed who was in the breakroom. I*
> *went over to the cooler and came back about 8:20 pm and Terry Laney was*
> *still in the breakroom. Mike Jackson and I were on the floor and we saw Terry*
> *Laney coming up on the floor about 8:25 PM.*

Company Exhibit 3.

Thus, according to their written statements, in the break room at 7:50 PM

Simms and Jackson noted the clock time, and *merely observed* Grievant, without

interacting with him. It is readily apparent that when Jackson wrote in his statement,

"*Antoine and I acknowledged the time Terry came in for break*", he was not indicating any

interaction with Grievant in the break room. T27-28; 37-39.

The absence from Simms' contemporaneous written statement of *any* mention of *any conversation, discussion or interaction* with Grievant in the break room on April 4, at any time at all, is conspicuous.

In contrast, Simms testified vaguely on direct examination that he and Jackson jointly conversed with Grievant as they entered the break room simultaneously at about 7:50 PM: "***We spoke to Terry, Terry spoke back.*** *We proceeded on and he took his break.*" T55. (**emphasis** added). This is not corroborated by Jackson's testimony (T27-28; 37-40), nor is it corroborated by either supervisor's contemporaneous written statement. Company Exhibits 2 and 3.

Again, neither supervisor memorialized *any break room conversation, discussion or interaction whatsoever* taking place with Grievant at any time on April 4 – even though both supervisors prepared their written statements shortly after the events in question: Jackson typed his statement the next day, when the events were fresh in his mind. T50-51; 83. Simms typed his statement the night of the incident, when the events were fresh in his mind. T66-68; 83.[4]

Notably, 24-year production employee Curt "Marty" Riegel (all 24 years at the Granite City plant) testified on direct examination that in the break room, Simms

---

[4]     Simms is a six (6)-year employee, all at the Granite City plant. He has been a supervisor for three (3) years. For three (3) years before that, he was a production worker in the bargaining unit. Jackson is a 22-year employee, all at the Granite City plant. He has been a supervisor for two (2) years. Before that, he was a production worker in the bargaining unit, including approximately two (2) years as a Union shop steward.

"asked *us* about *our* breaks. . . . [t]hat *we* had took too long on *our* break, or he indicated *that.*" T106 (**emphasis** added). Riegel was referring in this testimony to himself **and Grievant**, at about 8:20 PM. T106-107; 110-111. Riegel's testimony withstood Company counsel's thorough cross-examination (T109-111), and corroborates Grievant's testimony in this regard. T119.[5]

As noted above, Simms testified on direct examination that at 7:50 PM there was no one else in the break room other than he, Jackson and Grievant, all entering at the same time. T55. Simms maintained on cross-examination that Grievant was *"by himself" all alone* in the break room at 7:50 PM. T68-69. It is therefore unlikely that half an hour later, at 8:20 PM, when according to Simms he knew Grievant had been in the break room for 30 minutes on a 15-minute break, that Simms would have spoken to Riegel (whom Simms testified was *not* in the break room at 7:50 PM) about Riegel's break time (T106-107; 110-111), but *not* have spoken to Grievant – sitting alongside Riegel – about Grievant's *30 minute* break. Yet, this is what Simms unpersuasively maintained in his testimony: that at 8:20 PM in the break room he did not speak to Grievant at all; did not discuss Grievant's unauthorized double-length break; and did not tell Grievant to return to the work floor. T55-58; 69-70.

---

[5]     Two (2)-year production employee Steven "Steve" Holman's testimony about a conversation with Grievant when Grievant was on his way from the break room to the work floor also tends to corroborate Grievant's testimony in this regard. T167. However, Holman's written statement makes no mention of this conversation. Holman's testimony about his written statement did not withstand Company counsel's thorough cross-examination. T171-176. Therefore, Holman's testimony about this conversation with Grievant is not persuasive.

It is also unlikely and thus unpersuasive that Simms would have had a conversation with Riegel in the break room at 8:20 PM about bringing the production break-relief sheet upstairs (T56-57), but not have said *anything* about break time to Grievant (T57-58; 69-70) – who was undisputedly sitting alongside Riegel at the same table, at the same time (T55-56, 69; 110-111).

The arbitrator finds that the several material and unexplained break room discrepancies in the record circumstantially lead to the conclusion that it is likely Simms and Grievant were alone in the break room for a period of time shortly after 7:50 PM, during which they interacted; that they again interacted in the break room at 8:20 PM; and, that what transpired between them during these interactions in the break room was sufficient to constitute a modicum of provocation which carried over to their related work floor interaction shortly thereafter.

## Grievant's Insubordinate Behavior and Threatening a Supervisor

The CBA does not define the terms "*insubordinate behavior*" or "*insubordination*". The work rules do not expressly define these terms. Dictionary definitions of "*insubordinate*" include: "*not submitting to authority, rebellious*". *New Webster's Dictionary and Thesaurus of the English Language* (Lexicon, 1992); and "*not submissive to authority; disobedient or rebellious*". *Collins English Dictionary* (HarperCollins, 2019).

Grievant's statement to Simms on the work floor meets these definitions of "*insubordinate*", and, Grievant's statement contained abusive language. The work rules, openly and continuously posted since 2011, and of which Grievant undisputedly had notice, prohibit insubordination. The reasonableness of the rule is not challenged, and

the rule appears reasonable on its face. Thus, the Company proved that Grievant

engaged in "*insubordinate behavior of abusive language toward a supervisor*" in violation

of the work rules.[6] Joint Exhibits 7 and 4.

The CBA does not define the terms "*threat*", "*making a threat*", or "*threatening*".

The work rules do not expressly define these terms. Dictionary definitions of "*threat*"

include: "*an avowed present determination or intent to injure presently or in the future. A

statement may constitute a threat even though it is subject to a possible contingency in the

maker's control . . . In determining whether words were uttered as a threat the context in

which they were spoken must be considered.*" *Black's Law Dictionary*, 5[th] Edition (1979).

Under the facts and circumstances of this record, Grievant's statement to Simms

was not "horseplay", and, exceeded the bounds of "shop talk". The work rules, openly

and continuously posted since 2011, and of which Grievant undisputedly had notice,

prohibit threats. The reasonableness of the rule is not challenged, and the rule appears

reasonable on its face. Thus, the Company proved that Grievant's work floor statement

to Simms constituted "*making a threat to a member of management*" in violation of the

work rules. Joint Exhibits 7 and 4.

_____

[6]     The Company asserts in its Brief that Grievant was also insubordinate in that "*he turned his back on Simms and walked away, refusing to participate in the counseling. Tr. 137; 138.*" Company Brief 12. The record indicates that Grievant was aware that walking away from a supervisor's work-related discussion is unacceptable. On cross-examination Grievant acknowledged receiving a documented verbal warning for an incident with supervisor Clark when Grievant was a four (4) month employee. Grievant's assertion that Clark was "*fired for the situation*" (T132) is not substantiated in this record. Nonetheless, the arbitrator is cognizant that for the April 4, 2018 incident at hand, the insubordination charge is limited to "*abusive language toward a supervisor*". Joint Exhibit 4.

**Grievant Threatening a Supervisor Constituted Serious Just Cause Under CBA**
**Section 11.1**

CBA Section 11.1 requires at least one (1) written warning notice for discharge.

However, the parties created an exception to this warning notice requirement. Section

11.1 also states that:

> [N]o warning notice need be given to an employee before he is discharged if
> the cause of such discharge is dishonesty, or drunkenness or drinking of
> intoxicating liquor on the job, or being under the influence of or in the
> possession of illegal drugs, or the illegal use of dangerous drugs while on duty,
> or recklessness resulting in serious accident while on duty, or serious just
> cause.

Joint Exhibit 1.

The Company did not given a written warning notice for the discharge at hand.

There is no allegation of *"dishonesty, or drunkenness or drinking of intoxicating liquor on*

*the job, or being under the influence of or in the possession of illegal drugs, or the illegal use*

*of dangerous drugs while on duty, or recklessness resulting in serious accident while on*

*duty . . . "*. The parties strongly dispute the existence of *"serious just cause."*. If *"serious*

*just cause"* existed, the Company was not required by the CBA to give a written

warning notice. If *"serious just cause"* did not exist, the Company was required by the

CBA to give a written warning notice.

In the exception clause, the parties chose to specifically set forth dishonesty,

liquor and drug offenses, and recklessness resulting in a serious accident. The parties

also chose to conclude the exception with the phrase, *"or serious just cause"*. The CBA

does not define *"serious just cause"*.

The parties did not limit the exception to *"or **other** serious just cause"*, or, *"or*

_similar_ _serious just cause_", or use other such limiting/defining language. Thus, the arbitrator finds that when the words "_or serious just cause_" are given their plain meaning within the phrase and context in which they appear, it is evident that the parties did not intend to exclude threatening a supervisor from consideration of constituting "_serious just cause_".

Company Vice President of Human Resources, Harold Papen ("Papen") gave credible and unrebutted testimony that threatening a supervisor is _serious just cause_ under the CBA because, "_threatening the supervisor undermines the authority of the supervisor, and quite frankly, I have done this for over 40 years, you can't get or keep supervisors if they are going to be threatened on the job._" T17-18.[7]

Thus, the record establishes that threatening a supervisor undermines supervisory authority. Undermining supervisory authority, as well as the inability to get or keep supervisors, threatens the good order and efficiency of plant operations. Threatening the good order and efficiency of plant operations threatens the Company's business (and, by extension, the livelihoods of Grievant and other employees). Thus, threatening a supervisor is a serious matter, even by a dictionary definition of "serious" cited by the Union: "_[i]mportant; weighty; not trifling; grave_". Union Brief 18.

Based on the above, Grievant's statement threatening a supervisor on the work floor on April 4, 2018 constituted "_serious just cause_" under CBA Section 11.1. This conclusion is not inconsistent with Arbitrator Sonneborn's Decision and Award, dated

---

[7]        Human Resources VP Papen has worked in the dairy industry for 29 years, 12 of which have been with the Company. T17.

May 5, 2018. Company Exhibit 10.

Therefore, the CBA did not require the Company to give a written warning notice prior to terminating Grievant's employment for threatening a supervisor.[8]

Just Cause for Discharge

Apart from the *"serious just cause"* rationale regarding written warning notice, discussed above, the Company must still satisfy the CBA requirement of *just cause* for discharge. CBA Section 11.1 clearly and unambiguously states that: *"The Employer shall not discharge nor suspend any employee without just cause, . . . "*. Joint Exhibit 1.

The previously quoted plant work rules provide clear standards of behavior. There is no contention that the posted rules are unreasonable, nor do they appear *prima facie* unreasonable. It is undisputed that these rules have been openly and continuously posted in the plant since at least 2011, and that Grievant – hired in 2014, had notice of them. As discussed above, the record establishes that Grievant violated the cited work rules by threatening Simms on the work floor,[9] and using abusive language toward him, as charged.

Prior to Grievant's termination, Diak interviewed supervisors Jackson and Simms, both of whom heard Grievant threaten Simms on the work floor. Prior to

---

[8]     Because Grievant's charged and proven statement threatening a supervisor constituted *"serious just cause"* under CBA Section 11.1, it is not necessary to determine whether Grievant's charged and proven *"insubordinate behavior of abusive language toward a supervisor"* constituted *"serious just cause"*.

[9]     Because Grievant's statement to Simms on the work floor constituted a threat sufficient for a finding of just cause to discharge, it is not necessary to determine whether Grievant's statement to Simms in the office constituted a threat.

Grievant's termination, Diak interviewed Union shop steward Jake LeMaster, and production employee Robert Bracely, with Union representation present. Production employee Eugene Williams "made a statement".[10]   Production employee Janet Illig refused to make a statement, saying she did not want to be involved. T92-93.[11]

Grievant was interviewed, *before* his termination, with Union representation present. Grievant had the opportunity to tell his side of the story, both at the interview before termination, and again at the Local Level Meeting between the Union and the Company, after termination. Grievant denied making any threats. There is no record evidence that Grievant informed the Company that there was break room interaction, or identified Riegel as a break room witness. Additionally, Grievant stated to Diak that Martin and Holman, who were not interviewed before Grievant's termination, were probably too far away [from the work floor interaction]. T84-85; 92-93.[12]   It is undisputed that neither Martin nor Holman were break room witnesses.

Thus, it is not persuasive from the record that the Company's investigation was unfair, inadequate, or insufficiently full or thorough before the Company decided to terminate Grievant's employment. The Union's arguments that the Company's investigation was "*offensive to the notion of industrial due process*", and, that the decision

---

[10]   Diak testified that Williams "*made a statement*". The record does not indicate whether Williams was interviewed, and/or gave a written statement. T85; 93. At the time of the hearing he was no longer employed by the Company (for unrelated reasons), and did not testify.

[11]   LeMaster, Bracely and Illig did not testify at the hearing.

[12]   Martin and Holman did testify at the hearing.

to terminate Grievant was "*made without a reasonable inquiry into the relevant facts*" (Union Brief 16-17) are thus not persuasive. Grievant was not denied due process.

It is persuasive from the *testimonial* evidence about the Local Level Meeting that when Grievant was directly asked if he made any threats to Simms on the work floor, Grievant's answers were vague and evasive.[13] Grievant at first gave no answer, no response; then said he did not recall; and then denied making any threat. Grievant testified that he did not threaten Simms, and, that at the Local Level Meeting he was being "*sarcastic because of everything that was going on. I was upset.*" T130. Grievant's testimony in these regards was not persuasive.

There is no record evidence that the Company inconsistently applied the work rules, or its policy of enforcement, or condoned inconsistent application or enforcement, or that Grievant received disproportionate or unequal treatment.

Therefore, based upon all of the foregoing, except for the mitigating factors discussed below, the Company met its burden to prove it had just cause to discharge Grievant for making a threat to Simms on the work floor.[14]

---

[13]     Company Exhibit 4, Diak's typed notes of "*Local Level Meeting Local 525 May 9, 2018*", was conditionally admitted into the record during the hearing. T92. The Union asserts in its Brief that the condition was not met. Union Brief 9. The Union's assertion is unrebutted. Therefore, Company Exhibit 4 is deemed *not* part of the record, and has been disregarded by the arbitrator.

[14]     Because Grievant's charged and proven threatening statement to Simms on the work floor constituted just cause for discharge under CBA Section 11.1, it is not necessary to determine whether Grievant's charged and proven "*insubordinate behavior of abusive language toward a supervisor*" constituted just cause for discharge.

## REMEDY/PENALTY/MITIGATION

The work rules clearly state that, "*corrective action may range from verbal and written warnings, to suspension and discharge depending on the seriousness of the infraction.*" It is undisputed that the work rules have been posted since 2011, and that Grievant – hired in 2014, had notice of them prior to April 4, 2018. Human Resources VP Papen gave credible and unrebutted testimony that the Company has a consistent practice of *always terminating* employees who threaten supervisors. T18.

Grievant threatened a supervisor. However, there are mitigating factors in this record that cannot be ignored. Primarily, that what transpired between Simms and Grievant in the break room, which carried over to their related work floor interaction shortly thereafter, was sufficient to constitute a modicum of provocation. In light of the element of provocation, it is also mitigatory that Grievant's threatening language to Simms was idle rather than imminent, and was not followed by physically threatening conduct. It is undisputed that the work floor was noisy because of the nearby machines and conveyor belts in operation at the time, and that both Grievant and Simms were wearing mandatory hearing protection. Thus, they were initially face to face in order to hear each other. When Grievant uttered his threat to Simms they were again face to face, in closer proximity than before. Although in closer proximity, it is undisputed that there was no physical contact, nor is there any allegation of a raised hand, clenched fist, or the like. Also relevant here, Grievant has no disciplinary history of threats or violence, albeit he is a relatively short-term employee, with four (4) years of service.

## CONCLUSION

The Company has a consistent and established practice of discharge for threatening a supervisor. Grievant threatened a supervisor. To be clear, were it not for the aforesaid combination of mitigating factors, the Company's practice would prevail. This Opinion and Award should not be construed to condone *any* threats against a supervisor. Nor should this Opinion and Award be construed to prohibit a supervisor from discussing a work-related matter more than once with an employee.

Based upon thorough review of the entire record, the Company met its burden to prove it had serious just cause, as that term is used in CBA Section 11.1, to discharge Grievant without giving a written warning notice. However, under the mitigating facts and circumstances of this particular record, and consistent with the just cause for discharge requirement of CBA Section 11.1, Grievant's discharge is reduced to a time-served suspension, without pay.

Accordingly, Grievant is reinstated, subject to the parties' usual reinstatement conditions, if any. The record does not provide guidance regarding such conditions, if any. Therefore, the arbitrator will retain jurisdiction for sixty (60) days over any issues arising from implementation of the Award

**Grievant is cautioned** that in the future, the same or similar proven conduct may persuade an arbitrator that mitigation is *not* warranted. If an employee does not like the content or manner of a supervisor's discussion with the employee – such as Grievant's testimony that Simms was treating Grievant "*like a child*", treating Grievant "*in a disrespectful way*", and/or "*abusing his authority as a supervisor*" – the long-posted

work rules clearly state: *"The grievance procedure of the Master Dairy Agreement is available to resolve disputes.* In other words, *"**Listen now, grieve later.***"

Based upon all of the foregoing, it is not necessary to address the parties' remaining contentions.

Consequently, the following Award is issued:

[Remainder of this page is intentionally blank]

## AWARD

1.  The grievance is denied in part and sustained in part.

2.  The Company had serious just cause, as that term
    is used in CBA Section 11.1, to discharge Grievant
    without giving a written warning notice.

3.  Under the mitigating facts and circumstances of
    this particular record, and consistent with the
    just cause for discharge requirement of CBA
    Section 11.1, Grievant's discharge is reduced to a
    time-served suspension, without pay.

4.  Accordingly, Grievant is reinstated, subject to
    the parties' usual reinstatement conditions, if any.

5.  Jurisdiction is retained for sixty (60) days for any
    issues arising from implementation of this Award.


Dated: August 30, 2019                    Robert A. Grey, Esq., Arbitrator

## AFFIRMATION

I hereby affirm that I executed this instrument as my Opinion and Award.


Dated: August 30, 2019                    Robert A. Grey, Esq., Arbitrator